UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Tera Cunningham,

Plaintiff,

**Hon. Hugh B. Scott**

04CV301Consent

v.

**Decision & Order**

Town of Ellicott, et al.,

Defendants.

Before the Court is the defendants' motion for summary judgment (Docket No. 67).

**Background**

Plaintiff, Tera Cunningham ("Cunningham"), is a former patrol officer for the Town of Ellicott. She brings this action claiming that her rights under Title VII of the 1964 Civil Rights Act (42 U.S.C. §2000 e, et seq.) were violated in that she was sexually harassed by Police Chief William Ohnmeiss ("Ohnmeiss") while she was employed with the Town. Named as defendants are Ohnmeiss, individually; as well as the Town of Ellicott, the Town of Ellicott Police Department, and Patrick Tyler, Ellicott Town Board Supervisor.

The plaintiff asserts that she was hired in April of 2001 by the Town of Ellicott as a part-time police officer after having previously served in that capacity for the Town of Westfield.

(Docket No. 17 at ¶ 9). In July of 2003, she was promoted to a full-time position on a one-year probationary basis. On March 5, 2004, Cunningham was advised in writing that she had "not successfully completed" her probationary period and that her employment was terminated. (Docket No. 69, Exhibit J).

Cunningham claims that beginning in 2002, she was subjected to unwelcomed sexual harassment by Ohnmeiss which resulted in a hostile work environment. According to Cunningham, after attending a Police Benevolent Association meeting in September of 2002, Ohnmeiss asked to see the plaintiff's underwear. The plaintiff states that when she refused this request, Ohnmess persisted for "nearly an hour" and ultimately dropped his pants in front of her (and two other individuals) revealing "gray boxer briefs and an erection." (Docket No. 17 at ¶¶ 12-13). Later, Ohnmeiss is alleged to have approached Cunningham while she was alone, and asked her to stick out her tongue. When she refused to do so, Ohnmeiss called her "a chicken" and purportedly referring to his male genital, told Cunningham that "little Bill" had just "moved." The plaintiff claims that Ohnmeiss then allegedly attempted to French kiss Cunningham, but she got up and moved away. (Docket No. 17 at ¶¶14-15). Ohnmeiss is also alleged to have asked Cunningham if she "shaved down there," presumingly referring to the plaintiff's pubic area. (Docket No. 17 at ¶ 16). Cunningham also alleges that Ohnmeiss "trapped" her in a bathroom and grabbed her breast while asking her if she would "do him" for a "full time job." (Docket No. 17 at ¶ 18).

The plaintiff alleges that in November of 2002, while she was out on patrol, Ohnmeiss asked her to meet him at an old drive-in on Route 380. At that time, Ohnmeiss is alleged to have told Cunningham that if the plaintiff ever told anyone about his ongoing behavior toward her,

that he would "deny everything" and that he would "kill himself." Cunningham alleges that Ohnmeiss laid his hand on hers, but that she quickly pulled her hand away. Cunningham asserts that Ohnmeiss informed her that he would not know what to do if she became a member of the Union, because of the job protections afforded to Union members. (Docket No. 17 at ¶¶ 21-23).

Cunningham alleges that in June of 2003, about one month before being appointed to a full-time position, she was alone with Ohnmeiss in her patrol car. She contends that Ohnmeiss informed her that there would be a full-time position opening up and that she should be prepared to "do her part." (Docket No. 17 at ¶ 24). One week before Cunningham's appointment to the probationary full-time position was to be ratified, she asserts that Ohnmeiss directed her to meet him down in the boiler room of the police station. The plaintiff contends that at that time he "leaned into" her and asked her "are you ready to do your part?" (Docket No. 17 at ¶ 25).

Throughout this time period, Cunningham asserts that Ohnmeiss would frequently refer to his genitalia in front of her as "little Bill" or "turtle-turtle." She claims that when an attractive women would come into the police station, Ohnmeiss would state "go back in turtle- turtle." (Docket No. 17 at ¶ 26). The plaintiff alleges that during her employment with the Town of Ellicott Police Department, Ohnmeiss would make persistent unsolicited comments such as: comments about his sex life; sex with his wife; that he could masturbate eight times a day; about girls that he would "hit on" when he went out with the guys; how he tried to sexually seduce a waitress at a restaurant called "Pal Joeys"; about his daughter's sex life; about his sexual escapades as a young man in the military, particularly with "ten dollar prostitutes"; and how he wanted to do a "threesome" with his cousin. (Docket No. 17 at ¶ 27). Finally, the plaintiff alleges that Ohnmeiss would routinely ask her if she had sexual intercourse with her male co-

workers. Cunningham asserts that all of these comments were unwelcome and affected her ability to work as a patrol women (Docket No. 17 at ¶ 27).

Cunningham asserts that after she rejected all of Ohnmeiss' sexual advances, she was subjected to "undue scrutiny" that eventually culminated in the recommendation of her termination by Ohnmeiss, which was ratified by the Town without further investigation. She claims that Ohnmeiss "cooperated" with a complaint filed by one of Cunningham's co-workers, Jim Curtis, alleging that she did not live in the Town of Ellicott as was required for the position.[1] (Docket No. 17 at ¶ 29). In September of 2003, Cunningham asserts that she complained to Ohnmeiss that Curtis was "stalking her" but that Ohnmeiss did nothing other than to tell her she "better not go around repeating" the allegation to anyone. (Docket No. 17 at ¶ 33). The plaintiff claims that her attorney contacted Ohnmeiss and informed him that Curtis' conduct was "potentially actionable." At the same time, according to Cunningham, she complained about Ohnmeiss' sexual harassment to Town Board member Brian Taylor. (Docket No. 17 at ¶ 33-34).

The plaintiff alleges that she was subjected to other undue scrutiny as well. She claims that on "numerous occasions" she was told that the length and style of her hair was too "distracting" to the men; that her mailbox was too full; and that her attitude was poor. She claims that male patrolmen were not subject to this scrutiny. (Docket No. 17 at ¶ 36-39). In addition, she claims that she was served with a counseling memo because she "ran" her own license plate even though she had her supervisor's permission. (Docket No. 17 at ¶ 51). The plaintiff alleges that during this time, she was first told that she was writing too many tickets and

---

[1] Cunningham alleges that she hired an attorney to refute this claim and was able to maintain her job. (Docket No. 17 at ¶¶ 30-31).

that she should stop; then she was told she was not writing enough tickets. (Docket No. 17 at ¶ 52).

Finally, Cunningham asserts that she was vilified for complaining about the conduct of the Ellicott Police Department with respect to the special treatment allegedly afforded to Joshua Tyler, son of the Ellicott Town Supervisor Patrick Tyler. The plaintiff contends that Joshua Tyler was stopped for speeding on October 26, 2003 by Officer Brandon Maggio. According to the plaintiff, Maggio determined that Joshua Tyler's license had been previously revoked and that cocaine was found during search of young Tyler's car. According to Cunningham, Joshua Tyler was processed on the driving charges but not charged with possession of cocaine. Instead, the plaintiff contends, Patrick Tyler was summoned to the scene, and Joshua Tyler was "released" to his father. Cunningham alleges that she complained about the special treatment to Ohnmeiss but was told to "keep quiet."[2] (Docket No. 17 at ¶¶ 40-46).

On March 5, 2004, Cunningham asserts that she was notified that she was being terminated as of March 19, 2004. The plaintiff contends that the Town Board, and not Ohnmeiss, is the appointing authority with respect to the Town police officers. Cunningham asserts that on March 8, 2004, she sent the Town Board members a copy of a charge of discrimination she filed with the Equal Employment Opportunity Commission ("EEOC") on that date. The plaintiff also points to the fact that the local newspaper, The Post Journal, published an article on March 9, 2004 noting that Cunningham had filed sexual harassment charges against the

---

[2] The plaintiff claims that Ohnmeiss' employment status as Chief of Police with the Town was probationary at the time, and that his failure to charge Joshua Tyler with possession of cocaine may be related to his desire to have a permanent contract with the Town. (Docket No. 17 at ¶47).

Police Department and Ohnmeiss. (Docket No. 17 at ¶ 62-64). Thus, she asserts, on March 15, 2004, when the Town Board met to, among other things, deal with Cunningham's termination, the Town Board members were aware that Cunningham had engaged in protected activity by filing a complaint with the EEOC. Notwithstanding, according to the plaintiff, the Town Board voted to ratify Ohnmeiss' decision to terminate Cunningham after a 15-minute closed Executive Session without investigating any of her claims of harassment. (Docket No. 17 at ¶ 67-68).

The Amended Complaint asserts the following claims: (1 & 2) that the defendants "engaged in a pattern of illegal retaliation because the Plaintiff had complained about sexual harassment at the workplace to the EEOC on March 8, 2004 in violation of Title VII and the New York State Human Rights Law, ["NYSHRL", Executive Law §290] (Counts 1 and 2 respectively); (3 & 4) that Ohnmeiss engaged in a pattern of unlawful sexual harassment including quid pro quo harassment, that created a hostile work environment in violation of Title VII and the NYSHRL (Counts 3 and 4, respectively); (5) that the defendants conduct violated the plaintiff's First Amendment and Equal Protection rights in violation of 42 U.S.C. §1983.

Ohnmeiss denies the plaintiff's allegations that he sexually harassed her. (Docket No. 69 at ¶ 6). He admits meeting with Cunningham at the old drive-in on Route 380, but states that he informed her that his wife had been diagnosed with a serious illness and that "nothing of a sexual nature" was discussed at that time. (Docket No. 69 at ¶ 7). Ohnmeiss acknowledges speaking to the plaintiff in "the vault area" prior to her becoming a full-time officer, but contends that he indicated to her that her responsibility as a full-time officer "placed her in a different level" than that of a part-time officer in terms of job duties. He denies making any sexual advance or intimating that sexual favors were part of the job or her being considered for the promotion.

(Docket No. 69 at ¶ 8). Ohnmeiss denies that the decision not to prosecute Joshua Tyler was to gain favor with members of the Town Board. (Docket No. 69 at ¶ 10). Ohnmeiss asserts that Cunningham was disciplined for failing to sign in daily and properly log hours as a part-time employee; failing to assure the town building was locked upon leaving; insubordination and failure to log in evidence; failure to complete arrest reports; and failure to maintain her mailbox. (Docket No. 69 at ¶ 9). Ohnmeiss contends that on March 5, 2004, he convened a meeting with the Field Training Officers of the Town Police Department regarding Cunningham. He states that the meeting lasted for two hours and that they discussed options other than terminating Cunningham, but that the consensus of the group was to terminate her employment prior to the conclusion of her probationary period. (Docket No. 69 at ¶ 11).

**Standard of Review**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. See Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F. 2d 186, 188 (2nd Cir. 1992) citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). To prevail on its summary judgment motion, the moving party must show that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir.2001).

In discrimination cases, the inquiry into whether the plaintiff's sex or race caused the conduct at issue often requires an assessment of individuals' motivations and state of mind,

matters that call for a "sparing" use of the summary judgment device because of juries' special advantages over judges in this area. . Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998); accord Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir.1998) (noting juries' possession of the "current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications").

Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must "do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). See Distasio, 157 F.3d at 61. She must come forth with evidence sufficient to allow a reasonable jury to find in her favor. See McCarthy v. New York City Technical College, 202 F.3d 161, 167 (2d Cir.2000). In this regard, the non-moving party must, "demonstrate to the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit Information, Co., 970 F.2d 1110, 1112 (2nd Cir. 1992), citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A fact is material:

> when its resolution would "affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2nd Cir. 1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor. See Anderson, 477 U.S. at 248; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998). Thus the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." Byrnie v.

Town of Cromwell, Bd. of Educ. 243 F.3d 93, 101 (2d Cir. 2001). "The non-moving party must come forward with enough evidence to support a jury verdict ... and the ... motion will not be defeated merely ... on the basis of conjecture or surmise." Trans Sport, supra, 964 F.2d at 188. Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2nd Cir. 2000) quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**Title VII Shifting Burdens**

Under the burden-shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff first must establish a *prima facie* case of discrimination based on gender. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas, 411 U.S. at 802. To establish a *prima facie* case of gender discrimination, the plaintiff must satisfy the following four elements: (1) that plaintiff falls within the protected group, (2) that plaintiff was qualified for the position, (3) that plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination. McDonnell Douglas, 411 U.S. at 802 ; Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d. Cir. 1997).

If the plaintiff establishes a *prima facie* case of gender discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employer action. McDonnell Douglas, 411 U.S. at 802. If the defendant proffers such a reason, the presumption of discrimination created by the *prima facie* case drops out of the analysis, and the

defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000) citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519-524 (1993); see also McDonnell Douglas, 411 U.S. at 804; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075 (1997). The plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000).

In the context of a summary judgment motion in Cronin v. Aetna Life Ins. Co., 46 F.3d. 196 (2nd Cir. 1995), the Second Circuit ably discussed the shifting burdens in employment discrimination cases:

> In general, a plaintiff asserting an employment discrimination claim has the burden at the outset of presenting evidence sufficient to establish a prima facie case of discrimination. ... Once the plaintiff has adduced evidence sufficient to establish a prima facie case, if the employer proffers, " 'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action," ... the presumption of discrimination raised by the plaintiff's prima facie showing "drops out of the picture" ... . The plaintiff has the "ultimate burden of persuasion" to demonstrate that the challenged employment decision was the result of intentional discrimination. ... Though the plaintiff's ultimate burden may be carried by the presentation of additional evidence showing that "the employer's proffered explanation is unworthy of credence," ... it may often be carried by reliance on the evidence comprising the prima facie case, without more ... . Thus, unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie

> case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial. ... Though the plaintiff has the ultimate burden of proving the elements of the claim by a preponderance of the evidence, the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is "*de minimis*" ... .

Cronin, 46 F.3d. at 202-03.

Courts are particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir.1994); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). Because direct evidence of an employer's discriminatory intent will rarely be found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo, 22 F.3d at 1224.

**Sexual Harassment / Hostile Environment Claim**

In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997)); *see also* Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 78 (1998) (stating that a hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"). To meet

the first requirement, plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000). The Courts have explained that "[t]his test has objective and subjective elements: the misconduct must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Among the factors to consider when determining whether an environment is sufficiently hostile are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. In determining whether a hostile environment exists, we must look at the "totality of the circumstances." Richardson v. New York State Department of Correctional Services, 180 F.3d 426, 437-38.

In the instant case, the plaintiff has met her burden to establish a *prima facie* case of sexual harassment, including quid pro quo harassment, resulting in a hostile work environment. The Court notes that Cunningham only served with the Town of Ellicott police department for approximately 3 years. During that time, Cunningham has testified to several incidents of alleged inappropriate conduct on the part of Ohnmeiss. These alleged incidents – including but not limited to, the touching of the plaintiff's breast; Ohnmeiss' exposing his underwear and erection to the plaintiff; and numerous inappropriate comments of a sexual nature – are sufficient to establish a pervasive hostile work environment. Further, the plaintiff's allegations, if believed by a trier of fact, are sufficiently severe as to have altered the conditions of her employment with

the Town of Ellicott. The defendants have offered a legitimate nondiscriminatory reason for the plaintiff's termination – the plaintiff's alleged poor performance as a police officer. The plaintiff contends that the defendants subjected her to greater scrutiny than the other officers because of her refusal to acquiesce to Ohnmeiss' alleged overtures. Reviewing the totality of the circumstances as demonstrated by the record in this matter, a question of fact exists as to whether her termination was related to the alleged sexual harassment by Ohnmeiss.

The defendants motion for summary judgment with respect to the plaintiff's Title VII claim of sexual harassment is denied.

**Retaliation Claim**

In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir.2002). Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d. Cir. 2006).

In this instant case, the plaintiff alleges that she was terminated from her position in retaliation for filing a claim with the Equal Employment Opportunity Commission. It appears undisputed that on March 5, 2004, the plaintiff was advised by Ohnmeiss that she was to be terminated, as of March 19, 2004. However, the plaintiff contends that the Town Board of Ellicott, not Ohnmeiss, is the hiring and firing authority with respect to police officers, and that the Town Board did not take any action with respect to terminating her employment until March

15, 2004. The record reflects that Cunningham filed a complaint with the EEOC on March 8, 2004. The plaintiff contends that she advised at least one member of the Town Board of Ohnmeiss' harassment against her. Further, the plaintiff points to the fact that the local media published at least two news articles discussing her sexual harassment claims against Ohnmeiss prior to the March 15, 2004 Town Board meeting. The plaintiff argues that the Town Board nevertheless refused to investigate her claims of sexual harassment and to consider whether the allegations may have any bearing on her performance or the determination to terminate her employment.

It is undisputed that the plaintiff engaged in protected activity by filing a complaint with the EEOC. At the very least, questions of fact exists as to the following: who had authority to terminate the plaintiff's employment; was the firing authority aware that she had engaged in protected activity prior to the March 15, 2004 meeting; and whether the filing of the complaint with the EEOC impacted the determination to terminate her from employment with the Town.

Under these circumstances, the defendants' motion for summary judgment as to the plaintiff's retaliation claim is denied without prejudice.

## Conclusion

The defendants' motion for summary judgment is denied. **The jury trial in this matter shall proceed as scheduled to commence on October 16, 2006 at 9:30 a.m. The parties shall file limited pretrial statements by October 13, 2006.** The pretrial statements need only contain a list of witnesses intended to be called at trial and a list of exhibits.

Also, the plaintiff has filed a motion in limine (Docket No. 88). **The defendants shall respond to the motion by October 13, 2006**.

So Ordered.

/s/ Hugh B. Scott

United States Magistrate Judge
Western District of New York

Buffalo, New York
October 11, 2006